Good morning, and may it please the Court. My name is Dana Kumar, and I am an Assistant United States Attorney representing the government in this stay motion. The government is requesting emergency relief to stay the District Court's preliminary injunction order because the District Court improperly found that the government is not likely to prevail on the merits in this action. And if the order is not stayed, the government will be obligated to pay millions of dollars to the states that will be unable to recover, even if it prevails in the litigation. On this point, the balance of equities weighs in favor of granting the government's stay motion. The funds at issue here are funds that were appropriated by Congress as part of the large COVID relief packages, which amounted to billions of dollars for schools to address learning loss due to the pandemic and support the safe return to in-person instructions. The states entered into grant agreements with the Department, whereby the funds had to be until January 2025. The states did not do that. The states, however, could apply for an extension from the Department of Education, and those extensions were originally granted until March 2026. In March of this past year, the Department rescinded those extension requests, and the states moved the District Court for a preliminary injunction to go back to the pre-March 2018 Can I ask you about the Tucker Act issue? What is the difference between the funding in this case and in the California case? Your Honor, we don't see there is any difference. The California case involved Department of Education grants. There were different statutes, and there there was a cancellation of grants. So there's some differences. That's right, Your Honor. However, it's analogous, because here the states are seeking payment. It became clear in the District Court proceedings that what the states really want is payment of funds to use for their ongoing projects. Could you just be clear? What do you mean by really want? Isn't that what the plaintiffs really wanted in Bowen? Is that the test? Well, Your Honor, the test is whether Or is it more a belief that the court is granting? We're kind of stuck between Bowen and California, it seems to me. So maybe address that. The test is whether the rights and remedies of the parties really amount to a contract. And here it seems that the states are asking for the funding under the grant agreements that were awarded and that the Department has subsequently changed the time that the states are able to liquidate the funds under those agreements. How is that different from Bowen? I know Bowen wasn't a timing change, but it was what will pay you for change, right? Correct. So why would the same argument that you're making now not have been equally applicable in Bowen? Bowen involved the Medicaid scheme that involved ongoing relationships between the states and the federal government. And so it seems to be somewhat limited to that context. Why is this not? I thought this was ongoing for another year. If the liquidation period had not ended. It's ongoing for another year, but there is a clear termination date. So that's the difference. It's not ongoing for long enough? And if so, was that a distinction that was articulated in either Bowen or California? I don't think that precise distinction was articulated in either case, but California obviously post-dates Bowen and the court. You're not suggesting that California overruled Bowen, are you? I'm not suggesting it. But that would be the only relevance to post-dating, right? And, in fact, they distinguished Bowen, right? It did distinguish Bowen. So it didn't seem to suggest they were overruling Bowen in any way. They thought what they were doing was consistent with Bowen. That's right, Your Honor, except that Bowen, again, had to do with a specific regulatory scheme that is different from what's at issue here. Okay. The district court here ordered the department to do what? To process the requests that post-dated the new liquidation date? That's right, Your Honor. The district court ordered the department to process any requests received after March 28th and through the time that the preliminary injunction order is in effect to process the requests without delay. And under the pre-March 28th system, that meant that the payments would go out without review. So it would fall automatically, basically, that the grants would be made, that the payments would be made? That's right, Your Honor. The department would essentially just look to see if the receipts matched what the original funds were for. So if the state submitted something that was completely unrelated to the project that had been approved, then that wouldn't be okay. But for the most part, as long as the receipts matched, then the payments would go out. In your opening, you indicated that there was no ability by the department to get reimbursed in effect if these payments were made. Later, it was determined that those were improper. Are you basically arguing that the states are financially unable to pay back? In other words, if there's a short period of time during which these grants are paid out, why is there an inability of the department to obtain those payments back? It's my understanding that typically it is very difficult to recover monies from states pursuant to these types of grant agreements. And so if there is an overpayment by the federal government to the states, what sometimes happens is the federal government will draw down a future request from a state, so they'll sort of offset it from a future amount. But here that wouldn't be applicable because this is the end of the program, and so there wouldn't be any future amount to offset. Well, that's an easy way to do it, but presumably you can sue a state if they don't agree, pursuant to a court order to pay you back. That's perhaps true, but it would be burdensome and onerous, obviously, to enter into further litigation to recover funds from the states. Why would it have to be further litigation? Why wouldn't it be here in this case? If you, let's say, just proceeded to the merits and you win, and the court were to determine that the states got, I'll make it up, $50 million more than they should have, would this court not be able to, in this litigation, order the $50 million to be paid back? I think that is possible, Your Honor, but it's also true that the... Well, why not? Why would it not be? I mean, maybe it's not. I don't know. If it's not, tell me why not. I can't see any reason why that wouldn't be allowed, but it is equally true that the government would be able to reimburse the states because the money is still with the Department of Education. Well, that's a different question. I mean, I would certainly hope that would be true, but I thought your point is that you're facing irreparable harm, and I guess that's the question is usually we say if it's just money getting paid back, that's not irreparable. If it's just a question of money. Yes, that's true, Your Honor. The states have offered no assurances that they would pay back the funds, but I see no reason why, if the court ordered it, the states wouldn't do so. I see my... Thank you, counsel. Thank you. The government asked that the court grant the state a motion. Thank you. Ms. Vail? May it please the court, Judith Vail, for the plaintiff's states. The states should be denied because the district court here properly found that it had jurisdiction over this Administrative Procedure Act case in which the plaintiff's states challenged the department's purely regulatory change in position and seek purely forward-looking equitable relief. I'd like to turn to the California versus Bowen question. This case is distinguishable and different from California in three important respects. First of all, in California, the court said that the plaintiffs there were seeking to reinstate grants that had been terminated and that the federal government had said it would no longer perform, and that is what made those claims to the court more sound in breach of contract. The grants here have not been terminated. That is undisputed. The program would keep going, and in fact... If the performance date changes here, isn't that analogous to a contract claim? You know, effectively, you're arguing over when the performance deadline is. That's not... Is there otherwise a distinction in kind of the relationship between the parties? Yes, Your Honor, because here what the department did is a big step removed from canceling contracts, and then the fight would be should we reinstate them. Here, the federal government made a purely regulatory decision, first to grant the extensions and then to rescind them. That's a classic administrative change in position. And what the states are ultimately seeking here from the district court and what the preliminary injunction does is reinstate the extensions so that the states can submit timely reimbursement requests and the department cannot automatically reject them as untimely. But that does... Could you just clarify for me? You say this is regulatory in your case. You're saying it was not a regulatory action in California? Explain to me how one is regulatory and one was not. I mean, in California, there was a dispute over whether it was regulatory contractual, but there the court thought that the plaintiffs were pointing to specific contract terms as a part of their claim, and the defendants were pointing to specific contract terms and saying what we did here, although it's reflected in a regulation, is also reflected as a term in the contract in California. Here, the department has not pointed to any grant term. Any grant term that is at issue here. The liquidation period and the extension are all creatures of statute and regulation. They don't come from the grants. And I do want to emphasize that... Are you saying that in California there was some kind of a document that said this is a contract between the state and the federal government that there isn't here? I mean, I may be misunderstood. I thought that they were similar in terms of Congress-authorized money and that there was a process for applying for it and that there are terms by which they have to comply with the regulations to receive the money. That is true, but one of the things that was hotly disputed in California was whether the regulation there was so incorporated into the grant itself that it was also a grant condition, and there the termination of the contract was key to the court's decision because it thought that if it's sort of irrespective of the regulatory authority, the termination of the grant meant that the core of the claims there were seeking to reinstate a grant contract and that that was a contract claim at its heart. Here, we do not have a termination of a contract, and I want to emphasize that what the preliminary injunction does here and what the plaintiffs are seeking is about a process, not about an automatic payment. It is not true that automatic payment flows when the states submit a reimbursement request. I thought after the first PI, there were $200 million at the door. That's what the government says. Well, there's money that has flowed, but only after a subsequent process. So even before... Was anything rejected? I mean, it struck me as seeming virtually automatic, and was anything not? It is not virtually automatic. The Department has actually, with the terms of the PI in place, the Department has been seeking additional documentation from many of the states before issuing the reimbursement request, and the states have largely been complying and providing that additional documentation, and there's been back and forth. Some money has gone out. Some money is still pending. It's a little bit like submitting claims to your insurance company for medical expenses. If the insurance company cut you off and didn't even let you file a claim, reopening that period and letting you file a claim doesn't mean you get automatic payment. The insurance company is sure going to still check to make sure that you're seeking a medical expense and not last night's pizza order to get reimbursed. And the Department has made clear, and I think the parties agree here, that the Department can check to make sure that the reimbursement requests are for funds that were already obligated before September 2024. That's a basic statutory requirement. And the Department can check to make sure that the reimbursement requests are for projects that actually fit within the state plans that were previously approved and that are not at issue here. Now, I know that you said that you had three reasons why this is, in your view, distinct from California v. Ball. Would you maybe move on? I want to hear all three. Yes. But then I have another question before we get to the end about something different. Absolutely, Your Honor. The second reason is that the court thought in California that the claims there were seeking something like monetary damages because they were trying to enforce a specific contract term to pay money. And so that goes to the point that I was just talking about. We're here. We are not seeking to enforce a specific contract term to pay money. We are seeking to get the process where we can at least submit the requests and not have them automatically rejected. And that's a little bit like this Court's case in Polanco where ultimately the plaintiff there, like did in his heart, wanted to ultimately get his currency back that had been forfeited by the government. But this Court said that it nevertheless was a purely equitable claim for forward-looking relief because what the Court was potentially going to order there was to vacate the forfeiture process and give that plaintiff the proper notice and the proper process. And so we are seeking the process here of being able to submit and not have our requests automatically rejected. And the third reason why California is distinguishable goes to the irreparable harm. There the Court said that the states could keep the programs going without being able to get the federal teacher grant money that was at issue. Here there is unrebutted evidence in the record that the states cannot keep these programs going without even being able to try to access the funds. The local schools, which includes not just public schools but also religious and other independent schools, cannot afford to keep these programs going. In many instances they've already started projects and actually outlaid the money and are relying on being able to get reimbursed through the states back to... Can I ask you, that was actually the point that I was thinking was beyond your three. But there is a statement in the Supreme Court's decision in California that respondents, I guess it was California, had represented in this litigation that they have the financial wherewithal to keep their programs running. And at least that was one of the many things that the Court relied upon, their view that the state plaintiffs had made that representation. Can you just, for the absence of any doubt, tell us whether you can make the representation, can't make that representation, or make the opposite representation here? Well, I can say that the unrebutted evidence that was... There are many declarations that went into the district court in this case, and they made clear that the states cannot continue these programs. They're in the reply declaration, for example. I mean, Maryland made clear in its reply declaration that there are some private nonprofits that were trying to come in and keep some of the services going. But Maryland made clear that those efforts are not going to be enough. And so programs are going to need to be canceled. Construction projects that are in the middle might not get finished. And, you know, the sudden nature of the rescission here also goes to both the irreparable harm and the lack of any consideration of the reliance interests. Can I ask you about that, switching over from the ADA or APA lens? The reliance interests, I mean, all that's required is consideration of serious reliance interests, right? And so why isn't provision of the 14 days sufficient to reflect a consideration of it? You seem to find that inadequate, and it may well be, but it certainly reflects that they addressed it. I think it needs to be a meaningful consideration, and the 14 days is not a meaningful consideration because the 14 days was required by the district court in its first PI to make sure that the plaintiffs could run in for a... Why is meaningful the test? I mean, it's just whether consideration was given to it or not. Well, I don't think that consideration includes just saying the words reliance interests. I do think there has to be a reflection of a reasoned thought process going into the consideration of the reliance interests. The 14 days was required by the district court so that the plaintiffs could run in to get another TRO if a second rescission letter issued, which is what happened. It is not... It didn't have anything to do with the state's and the local school district's longer-term reliance interests in these funds, which have already been obligated, which means they're already under agreements with private companies, and in many cases, outlays have already been made or projects are already started. Fourteen days is just not a plausible amount of time. How far away would be enough? 90 days? I think it depends on the projects, Your Honor, and when these extensions were initially granted. The states provided very detailed information going through each project, explaining what it was and explaining why they needed additional time in the liquidation period. But your argument seems to be that the APA requires the federal government to actually accommodate those considerations, and that's not... That is not what the Supreme Court has said about what the change of position document requires. Our position is not that the department was required to grant the extension or even that there's no way that it could ever change its position. No. But if it's going to change its position, it needs to provide a reasoned explanation for doing so, and that is lacking here because, in part, the states provided all of this detailed information, the department reviewed it and accepted that information and justifications and said, yes, this is enough to get you the extension. And then the rescission letters are a sweeping categorical rescission. They don't address any of the information and specific justifications that the department had reviewed and accepted the last time. So, for example, in the extension applications, states explained that there were supply chain delays, labor shortages for projects like air ventilation or air conditioning, things that were in very high demand in the pandemic. And the rescission letter doesn't address any of that, even though the department had considered it and accepted it the last time. Instead, the rescission letter relies on improper factors and irrational justifications, such as saying that there is purportedly serious questions about the department's own initial review of the extensions. But that is belied by the record. There was detailed information provided to the department. The department said it did a careful review. And during the PI hearings below, defendants counsel said that on this record there was no reason to believe that the review was not careful. Can I ask you? I didn't see in the moving papers on either side when the initial extensions to March 26 were granted. Were they granted at different dates for different states, on a state-by-state basis, or on a project-by-project basis? Or what was the timing? Yeah, it is a range that changes a little bit based on the state and based on there's basically three buckets of money for three different programs. So it changes a little bit depending on which state. But would it be, say, one of the buckets and the other three programs, say, one bucket for New York, the extension was granted on a certain date as to everything in that bucket? Yes. So, for example, I'll give you an example. For Delaware, one bucket for the elementary and secondary relief. For the funds at issue here, which are the third tranche, the extension was requested in June 2024 and granted in August 2024. Then for the homeless youth program for Delaware, the extension was requested in September 2024 and granted in October 2024. So they sort of start, I would say, in the summer. Some of them are in the spring of 2024. That's the earliest one I've seen. And then they range into later. There are some that were requested in December or early January of 2024. That's helpful. And just so I'm understanding analytically where this particular argument fits for you, this is assumed that the APA applies, right? This is putting aside, if you can get past the Tucker Act jurisdictional question, this is going to why you think something is arbitrary or capricious, right? That is correct, Your Honor. That is correct. Just analytically, I want to know where that fits. Yes, that's correct. I have a question about what contracts actually were entered into, all right? So what I was able to pull off the Internet was the U.S. Department of Education Certification and Agreement for Funding. That certification and agreement says the department will award $2.75 billion to the governors of the approved states, et cetera, et cetera, and then goes on to say the amount each state is eligible to receive is indicated in Appendix B. So there's a contract, if you will, that was made at or about the time that states applied for funding, it's my understanding, and they had a maximum eligibility that they could apply for. Is there a contract, a subsequent contract, whereby the department contracted with, say, Delaware, we will pay you X million dollars? Yeah, unfortunately, the record is not super clear here. My understanding is that there are grant agreements, they're called GANs, I think, where there are some subsequent pieces of paper that are making clear, like, this is the allocation, and there is some detail there. Unfortunately, I don't have the full set in the record here. My understanding is that the state would then, once that agreement is in place, that GANs is in place, would then apply. You were talking about the insurance company, so there's a maximum amount that you can get coverage for and that you have to submit. There's no agreement to pay for sure any particular amount of money. This is not, we're going to give you X million dollars to use as you will. That is correct, Your Honor. The money was allocated in sort of like a, a lot of the allocation was based in the statute on the number of students, the proportionate number of students in different states. States did need to apply to get their allocation, but there is, as far as I know, there is no, there aren't subsequent agreements that say, we now agree to pay you X dollars for this ventilation-like project. What happens instead is there's this broad allocation. There were state plans that were provided for most of these programs that sort of broadly explained, here's how we plan to use the funds and why it will match with the statute, and those were approved. But then the way it sort of works is that the money, the states allocate the money for the most part, reserving a little to themselves, but they allocate the money to local education agencies that are then sort of mostly the ones running the projects, although the states run a lot of the projects for the religious and independent schools. And then the local agencies, once they incur an expense for an obligation that was made before September 2024, they seek reimbursement from the state. The state is in charge of seeking reimbursement from the department by submitting the reimbursement request within the liquidation period, and we are fighting about whether we can now submit those reimbursement requests within the liquidation period or whether the liquidation period has been shut off. Sorry, I need to be so loud. I'm very emphatic. And the May 11 letter, though, purports to change the, to rescind, I guess, the extension of the liquidation date. Correct. But why don't we view that as a change in the contract term with all of the documentation sort of behind it? Because the default 120 liquidation period for all education department grants is from statute and regulation, and the authority to grant an extension is from a regulation. So it is a creature of regulation and not a creature of the contract. And the contracts are still going. They have not been terminated. And one way you can see that... Which contracts have not been terminated? The underlying, like, approval of the grants, so this sort of broad allocation. I just need you to plug in subjects and objects there. Yes, yes. Who's approval of which contracts? The Federal Department of Education's approval of a state grant? Yes, correct. So there are these broad grant agreements. And I know there are three buckets per state. Yeah, yeah, yes. Is that what you're talking about? You're not talking about approval of a contract? Correct. When I say a contract, I want to know exactly, very precisely, concretely what you mean by a contract. Sure. When I say it's not been terminated, I mean the approval of the state plans which laid out the general ways that they would use the funds and the sort of corresponding grant papers that say this is your allocation from these programs. Is that the document that Judge Underhill was referencing? Correct, correct. And I do think there are multiple documents, but maybe another way to explain it is there is a separation between the initial approval of the allocation of the statutory money and the state plans that were submitted as part of that process. That's not at issue here. That hasn't been rescinded. That hasn't been canceled. That's still going. Even if the rescission period was cut off. And we know that because there is, the department said there is, although it was rescinding all of the existing extensions, there is this, they want you, they said there's an ability to apply again by resubmitting all the same information that was already provided. And I don't see how you could apply for a new extension to keep it going if the grants had been separately terminated. Can I ask you one different question? I'm sorry to shift gears, although this goes again to the Tucker Act question. You are making the argument to us that none of your claims are based on the terms of the grant themselves, and that's why I understand you to be arguing therefore you are not making a contract-based claim. Is it your argument then that the argument you are making, which are APA-based, would not be cognizable in any form in the Court of Federal Claims? Like you would walk in there and they would say, well what are you complaining about? There's no term in the grant. I don't see the problem. Or at least I don't see a problem that we have jurisdiction to consider. Am I fairly characterizing your argument? Correct, Your Honor. Our position is that the Federal Court of Claims does not have jurisdiction for this. The Tucker Act waives sovereign immunity for money damages claims, but you also need to have a substantive claim either under a contract or under one of the rare money-mandating statutes or regulations. And our position is we don't have either of those here. We are not pointing to a term of a contract and saying, look, this contract term is what we are enforcing, pay us now. And we are also not pointing to a regulation that is money-mandating. It's not the kind of regulation that you could come in to the Federal Court of And the Supreme Court in the Maine Community Health Options case sort of explained the rare money-mandating statute and gave an example of where that does exist. But here the regulation that's at issue is about extending, you know, administrative authority to extend a liquidation period or not. It doesn't require payment of money. And you're not saying that they violated the terms of the grant to the deal between the states and the Federal Government to rescind the extension of the liquidation period. Correct. We're not saying that. And they also didn't terminate the grant itself. Thank you, counsel. Thank you, Your Honor. Thank you both. We'll take the case under review.